**BUCK et al. v. HARTON, Treasurer of Tennessee, et al.**

No. 728.

District Court, M. D. Tennessee, at Nashville.

Feb. 19, 1940.

Cornelius, McKinney & Gilbert, of Nashville, Tenn., and Schwartz & Frohlich, of New York City (Charles L. Cornelius and William Neel McKinney, both of Nashville, Tenn., and Louis D. Frohlich and Herman Finklestein, both of New York City, of counsel), for complainants.

Roy H. Beeler, Atty. Gen., for Tennessee, and W. F. Barry, Jr., Asst. Atty. Gen., for defendants.

Before HICKS, Circuit Judge, and DAVIES and TAYLOR, District Judges.

PER CURIAM.

This suit having been duly commenced on April 18, 1938, by filing a subpoena and bill of complaint in this Court, and personal service of copies thereof having been made on said date upon the defendants originally named in this action, and the defendants John W. Harton, John J. Jewell, Marion S. Boyd, and Glenn Woodlee (said last named defendants having been substituted by stipulation in place and stead of Grover Keaton, W. B. Knott, W. T. McLain, and A. T. Stewart), and this Court having duly granted a temporary injunction on December 1, 1938, and this cause having come on for hearing on the ———— day of February, 1940, at the Courthouse of the District Court of the United States, Eastern District of Tennessee, at Knoxville, Tennessee, and this cause having been submitted upon all the papers and proceedings heretofore filed and had herein, and counsel for defendants having consented in writing to the entry of a final decree in favor of complainants upon said papers, and due deliberation having been had, the Court hereby makes the following Findings of Fact and Conclusions of Law.

Findings of Fact.

1. The State of Tennessee enacted a Statute entitled Chapter 212 of the Tennessee Public Laws of 1937 on May 21, 1937, which Statute became effective immediately. Said Statute is hereinafter referred to as the "Statute".

2. The plaintiff, American Society of Composers, Authors and Publishers, is a voluntary unincorporated association organized in 1914, under the General Associations Law of New York, Consol.Laws, c. 29. Its membership consists of a substantial number of persons, firms and corporations who own or control copyrighted vocal or instrumental musical compositions, as authors, composers and publishers. It brings this suit through Gene Buck, its president, who has been duly authorized to bring this suit on behalf of the Society and all its members. Other plaintiffs are certain individuals and corporations who are members of the Society and are interested in copyrighted musical compositions. They are all citizens and residents of States other than Tennessee.

3. The State Treasurer, the Secretary of State and the Attorney General, all of the State of Tennessee, as well as the District Attorneys General of the various circuits of Tennessee, all citizens and residents of Tennessee, are the defendants.

4. There are approximately 1,000 composer-members of the American Society of Composers, Authors and Publishers (hereinafter referred to as "ASCAP"), in the United States, and 123 publisher-members who constitute some of the principal publishers of the country. Each member has assigned to the Society the exclusive right of public performance for profit of his copyrighted musical compositions for periods of five years at a time, the present contracts between ASCAP and its members expiring December 31, 1940. ASCAP has issued blanket licenses to the users of its copyrights, by which the latter are permitted to perform publicly for profit at any time, all the musical compositions owned, written or composed by members of the

Society without requiring further consent of the owner of the particular composition performed. These blanket licenses include not only the right to perform the works of the members of the Society, but also grant the right to perform the works of some 44,000 members of other similar societies throughout the civilized world, with which societies ASCAP has contracts authorizing ASCAP to grant such licenses.

5. At the time the Statute was enacted, there were in existence 217 signed contracts between ASCAP and establishments in the State of Tennessee, engaged in the business of publicly performing copyrighted musical compositions for profit. During the year 1936, these licensees paid ASCAP $69,073.19 pursuant to such contracts. Aong such licensees of ASCAP were the owners of 166 motion picture theatres, 38 dance halls, hotels and miscellaneous establishments and 13 radio broadcasting stations. Among the 13 radio stations in Tennessee licensed by ASCAP, five are affiliated with the Columbia Broadcasting System, four with the National Broadcasting Corporation, three with the Mutual Broadcasting System and four with the Dixie Network. Part of the programs broadcast by the affiliated stations emanate from points outside of the State, and the remaining part initiate in the studios of such Tennessee broadcasters or elsewhere within the State. There are 459,900 radio receiving sets in private homes in the State of Tennessee. No license fees are paid by the owners of these receiving sets inasmuch as they do not engage in public performance for profit. The cost of operation of ASCAP is approximately 17% of the gross amount received.

6. ASCAP is given by its members the exclusive right to make collections, fix prices for blanket licenses, and otherwise carry on the licensing of the right of public performance for profit of all the musical compositions copyrighted by its members. Fifty percent of such net income was divided among the composer-and-members and the other fifth percent was divided among the publisher-members, in accordance with a method of classification defined in the Articles of Association of ASCAP.

7. Prior to the organization of ASCAP, authors, composers and publishers who had obtained copyrights for their productions had no practical means of enforcing the exclusive right given them by the Copyright Act. They were not so equipped nor organized to discover violations of their rights, and it would require much time and a large amount of money to detect infringement and to enforce their rights by means of litigation. None of them secured any revenue from the public performance for profit of their copyrighted musical compositions. Users of music, on the other hand, who wished to obtain the rights of public performance for profit, were unable to ascertain who the copyright owner was and to whom to go and could not economically obtain individual licenses for the separate performance of the large numbers of works required by them daily. It was for the purpose of protecting the legal rights of its members in their copyrighted musical compositions against infringements by public performance for profit, and to give users ready access to a substantial repertoire of music for such purposes, that ASCAP was organized.

8. ASCAP and its members, including the other complainants, come within the purview, terms, conditions, penalties, forfeitures, prohibitions, restrictions and regulative provisions of the Statute, and the members of ASCAP, including complainants, are affected in their rights by the terms and provisions thereof.

9. Complainants are jointly interested in the subject of the action and in obtaining the relief demanded; the questions raised by the bill of complaint are of common and general interest to all the members of ASCAP who constitute a class so numerous as to make it impracticable to bring them before the Court; complainants herein are suing on their own behalf and on behalf of all the members of ASCAP.

10. The value of the matter in dispute herein between each of complainants and defendants is in excess of the sum of $3,000, exclusive of interest and costs.

11. The copyrights of musical compositions owned by each of the corporate plaintiffs are worth in excess of $1,000,000, and the interests in copyrights of the individual plaintiffs, including the value of their renewal rights, are in excess of $100,000 as to each of them.

12. The contracts between the individual composer-and-author-members of ASCAP, including the individual plaintiffs and their respective publishers, do not give the publisher the right to dispose of the right of performance for profit, nor do they have any provision for payment by the publisher to the writer of any royalties secured from

issuing such licenses. Before ASCAP was formed, there were no royalties from this source and since the formation of ASCAP, both writers and publishers have relied upon ASCAP to collect royalties from this field on behalf of both and to distribute it equitably for the equal benefit of writers and publishers.

13. Users of music, including users in Tennessee, have uniformly objected to dealing with individual copyright owners for the licensing of the public performance for profit of musical compositions; ASCAP's practice has been to grant blanket licenses to theatres according to their seating capacity, to radio broadcasting stations, according to their income, power and coverage, and to hotels, cabarets and dance halls according to their respective size, business done, number and size of orchestras, methods of performance, income and standing. Many of such users have for many years consistently refused to pay license fees to ASCAP or its members, until investigations were made by ASCAP, infringements ascertained and suits brought.

14. The radio broadcasting stations in the State of Tennessee are members of the National Association of Broadcasters, which association on behalf of its members, for many years last past, has acted and presently acts collectively in dealing with ASCAP.

15. Under the contracts between ASCAP and said foreign societies, the latter are not required to, and never have, filed with ASCAP or with any State Authority, copies of the respective compositions copyrighted by their respective members, or lists of such compositions.

16. Many thousands of the copyrighted musical compositions owned and published by complainants, as well as others similarly situated, have been recorded under the compulsory license provision of Section 1(e) of the Copyright Act, 17 U.S.C.A. § 1(e), by manufacturers of phonograph records, music rolls and electrical transcriptions. Such manufacturers have paid to copyright owners not more than two cents for each record and said copyright owners have no right to demand any further sums from such manufacturers; complainants and others similarly situated have no control over the sale or disposition of such phonograph records, music rolls or electrical transcriptions and they cannot compel the manufacturers thereof to affix any price upon them or to collect a price for the public

performance for profit thereof, or if collected, to remit or give them the the sums so collected respectively for the public performance for profit thereof. Such manufacturers have no right, title or interest in the public performance for profit of such copyrighted compositions.

17. Complainants and others similarly situated are not willing to permit their musical compositions to be performed within the State of Tennessee publicly for profit on any basis wherein the price for such performance would be fixed upon a so-called per piece basis. Licensing on such basis would not be feasible and would be tantamount to depriving complainants of their exclusive right of public performance for profit.

18. The musical compositions of ASCAP's members and complainants have been for many years last past, and are presently being performed within the State of Tennessee in hotels, dance halls, taverns, motion picture theatres and broadcasting stations.

19. If the members of ASCAP including complainants tried to comply with the Statute they would each have to ascertain separately the nature of each establishment in the State of Tennessee, size of each orchestra, fame or celebrity of each artist, size of each establishment, its volume of business, its probable profits, elaborateness of the production, and size of its audience; they would each have to employ a corps of clerical assistants for the purpose of ascertaining the above information, investigators to detect infringement and competent counsel to obtain redress for the same; they would have to attempt to fix a separate price for each such establishment and to file a list with all the information required by the Statute; this would add substantially to the cost of the sheet music sold within the State of Tennessee, and would make it so great as to encourage infringement and interfere with, if not destroy, the sale of copyrighted sheet music in the State of Tennessee.

20. The Statute cannot possibly be complied with because:

(a) the public performance rights for profit fluctuate in value over the years; it is impossible for individual members of ASCAP, including the complainants, to specify at the time of publication of their musical compositions in the State of Tennessee what the price should be for various

public performances for profit of their respective musical compositions;

(b) the members of ASCAP, acting singly, do not have the financial resources, experience or ability to obtain the information necessary to enable them to designate a fair price of the public performance for profit of their musical compositions in the State of Tennessee, or to detect or redress infringement of their compositions in that State:

(c) it would be impossible under the Statute to protect large investments made in motion pictures and dramatico-musical productions which contain individual musical compositions, the separate and unrestricted public performance of which would destroy the value of such motion pictures and dramatico-musical productions; complainants would be compelled by the Statute to refrain from copyrighting the compositions embraced in such motion pictures and dramatico-musical productions in order to protect their investment therein; this would materially reduce the number of works copyrighted annually;

(d) it would cost complainants approximately $300,000 to attempt to compile and file the list required by the Statute and $50,000 additional each year to supplement such list annually.

(e) the statute cannot be complied with unless all complainants surrender their membership in ASCAP; this would entail a loss to each of the complainants in excess of $5,000, annually, representing the amounts which they normally receive annually from ASCAP; in some cases, such loss would be in excess of $50,000 annually; if not for the revenue received from ASCAP, complainant-publishers would be unable to continue in business.

21. The constant use of music by radio has shortened the life of a song resulting in a diminution ranging from 70% to 80% in the income to authors and composers from sales of sheet music and books of music. Sales of "hit" songs have fallen from an average in excess of 1,000,000 copies prior to 1927, to an average of 30,000 to 150,000 today. The income from mechanical royalties diminished ninety-seven percent.

22. A system of blanket licensing is necessary in the field of public performance of musical compositions for profit because:

(a) Many request numbers are played as spontaneous encores in the course of an evening's entertainment in dance halls, cabarets, hotels and radio. This is possible only under some form of blanket license, which allows users to make last minute substitutions made necessary by operating difficulties, failure of artists to show up, etc.; except in rare instances, radio broadcasters in the State of Tennessee and elsewhere have always taken blanket licenses for the right of public performance for profit whether such licenses were obtained from ASCAP or from others; if the Statute were upheld, the broadcasters in Tennessee would attempt to obtain the benefit of blanket licenses by purchasing from publishers entire catalogues; such users would not and do not propose to deal with individual copyright owners for specified compositions; users in Tennessee have no intention of dealing with individual composers or authors;

(b) It is difficult for users to report accurately the music performed by them. Large establishments with expert staffs keep no logs or records of such performances; it is inevitable that small stations would have greater difficulty because of lack of facilities and would be required to spend as much for this purpose as larger stations with substantially larger income; the clerical expense alone would be greater than the license fees now paid to ASCAP; by the use of the reservoir of available music, users are saved expenditures that would be entailed if each musical composition had to be separately applied for, cleared and reported;

(c) Dance halls and taverns utilizing the services of orchestras habitually permit their orchestra leaders to choose the music played; such orchestra leaders buy a considerable part of their own copies of music although some of it is obtained in the form of professional copies; orchestra leaders cannot tell when they purchase the music, at what establishments the same will be played or where the same will be performed, or under what circumstances; the purchase of music is an important item which must be taken into consideration by them and orchestra leaders cannot afford to pay any sums in excess of the sums which they now pay for sheet music.

23. Compliance with the Statute would require ASCAP and its licensees to abandon the contracts between them and would also compel each complainant as well as all the members of ASCAP to rescind their respective contracts with ASCAP.

24. Although complainants will be able to license users of their music in the State of Tennessee without doing any act in said State, the Statute prohibits complainants from so doing without incurring the penalties of said Statute.

■ 25. Said Statute is class legislation; it is aimed only at proprietors of music copyrights and no other copyrights, and it exempts the performance of musical works which are protected only at common law. A great many forms and varieties of copyrighted works other than musical compositions are presently and constantly dealt in, licensed, sold and otherwise made available within the State of Tennessee.

■ 26. Said Statute is not a reasonable exercise of the police power of the State of Tennessee; it was enacted, not in the public interest, but rather for the private benefit and gain of a group of users of music, in an organized effort to enable such users to have free access to the copyrighted works of complainants and others similarly situated.

■ 27. The system of licensing provided for in said Statute would deprive complainants and others similarly situated of their exclusive rights under the Copyright Act.

28. Defendants have threatened to and will enforce such Statute against these complainants and others similarly situated in the event that such complainants and others similarly situated refuse to comply with said Statute or do any of the acts made unlawful by said Statute.

29. Said statute is in its terms so drastic, and the penalties attached to the violation of the terms thereof are so great, that complainants have no adequate means of testing the validity of the Statute by violating the same and defending against a criminal or civil prosecution in the Courts of the State of Tennessee; if complainants attempt to issue licenses or collect from licenses or attempt to detect infringements of their copyrighted works in the 65 counties of the State of Tennessee where their works are being publicly performed for profit, they will be subjected to a multiplicity of suits and prosecutions; unless defendants are restrained, complainants will be unable to secure any compensation for the public performance for profit of their respective copyrighted musical compositions within the State of Tennessee.

30. Unless this Court determines the invalidity of the Statute, complainants and others similarly situated will be deprived of the exclusive rights granted to them under the United States Constitution and the Copyright Act, and will be without remedy for the enforcement of such rights within the State of Tennessee, therefore deprived of their property and liberty without due process of law, and denied the equal protection of the laws, in contravention of Article I, Sections 8, 9, and 10, Article III, Section 2, Article IV, Section 2, and Article VI, Clause 2 of the Constitution of the United States, and the Fourteenth Amendment to the Constitution of the United States, and are deprived of their rights in their respective copyrights under the Copyright Act of March 4, 1909, as amended. 17 U.S.C.A. § 1 et seq.

31. Complainants have no adequate remedy at law and are relievable only in this Court of equity.

### Conclusions of Law.

I. The Statute makes it impossible for complainants to issue licenses in the State of Tennessee for the public performance for profit of their copyrighted musical compositions, except at the risk of incurring prohibitive civil and criminal penalties of said Statute, and the confiscation of their copyrights.

II. The Statute destroys, nullifies and repudiates copyrights granted by the United States Government to complainants and their predecessors in interest.

■ III. The said Statute violates the treaties made between the United States and foreign countries, under which the nationals of such foreign countries are given reciprocal rights with American citizens with respect to American copyright, and in reliance upon the continued effectiveness of which ASCAP entered into various contracts with similar societies in said foreign countries, particularly with societies of the following countries: Argentina, Austria, Belgium, Brazil, Bulgaria, Czechoslovakia, Denmark, England, Finland, France, Germany, Hungary, Italy, Jugoslavia, Norway, Portugal, Rumania, Spain, Sweden and Switzerland.

■ IV. The Statute cannot be justified as a method of exercising the police power. The police power may not be extended to the extent of taking private

property for a public use, as is done by this Statute.

V. Said Statute denies to complainants equal protection of the laws, and denies to the complainants due process of law.

VI. Said Statute impairs obligations of contracts entered into between complainants and 217 users of music within the State of Tennessee; and contracts between members of ASCAP and ASCAP; and contracts between ASCAP and similar societies operating in foreign countries; and contracts between writers and composers and their respective publishers.

VII. Said Statute interferes with complainants' liberty of contract in the State of Tennessee or elsewhere.

VIII. Said Statute deprives complainants of their right of free access to the Federal Courts to maintain suits for infringement for the unlawful public performance for profit of their copyrighted musical compositions.

IX. Said Statute is vague, uncertain and indefinite and fails to appraise complainants and others similarly situated of what acts they may omit or commit which would constitute a crime under said Statute.

X. Said Statute subjects complainants to a multiplicity of suits by each of the 217 users within the State of Tennessee with whom they have contracts, by each of the District Attorneys General in the State of Tennessee and by the Attorney General of said State.

XI. The said Statute violates Article 1, Sections 8, 9, and 10, Article III, Section 2, Article IV, Section 2 and Article VI, clause 2 of the Constitution of the United States and the Fourteenth Amendment to the Constitution of the United States.

XII. Complainants have no adequate remedy at law and are relievable only in this Court of Equity, and if complainants are not afforded the equitable relief prayed for in the bill of complaint, but are required to resist, when criminal prosecutions and other suits or proceedings are instituted under said Statute, it will result in such a multiplicity of suits and entail such delay and so jeopardize and injure complainants in their persons and property as to make the remedy at law grossly inadequate; the penalties for violation of the Statute are so drastic that complainants have no adequate means of testing the validity of the Statute by violating the same and defending against a criminal or civil prosecution in the Courts of the State of Tennessee.

XIII. Complainants are entitled to a decree granting a permanent injunction restraining defendants, and each of them, from bringing or permitting to be brought, directly or indirectly, any proceeding at law or in equity for the purpose of enforcing said Statute against complainants and others similarly situated, their representatives, employees, agents or any of them; from demanding that lists of complainants' musical compositions and other data to be filed; from taking any steps to adjudicate the ownership of complainants' copyrights; from attempting to appoint a receiver; from interfering with existing contracts between complainants and others; including the Society and citizens and residents of the State of Tennessee; from enforcing or threatening to enforce against citizens or residents of the State of Tennessee, the penalties of said Statute in the event such citizens and residents desire to carry out their contracts with the Society; from prosecuting criminally the members of the Society including complainants and their representatives or agents, or any of them, for doing any act or thing to detect infringement and to enforce their respective rights under the Copyright Act; and generally from doing any act or thing to carry out or enforce any of the provisions of said Statute.

XIV. Complainants are jointly interested in the subject of the action and in obtaining the relief demanded; the questions raised by the bill of complaint are of common and general interest to all the members of ASCAP who constitute a class so numerous as to make it impracticable to bring them before the Court; complainants herein are suing on their own behalf and on behalf of all the members of ASCAP; Gene Buck, as President of ASCAP, is authorized to bring this suit on its behalf.

XV. Said Statute and each and every part and section thereof is invalid, and is hereby declared to be unconstitutional, illegal and void, and a decree may be entered making such declaration and granting the relief hereinabove provided for, and denying any relief to the defendants.