AEROVIAS INTERAMERICANAS DE PANAMA, S.A.; Aerolineas Peruanas, S.A.; Compania Cubana De Aviacion, S.A.; Compania Ecuatoriana De Aviacion, S.A.; Empresa Guatemalteca De Aviacion; Empresa De Transportes Aerovias Brasil, S.A.; Expreso Aereo Inter-Americano, S.A.; Guest Aerovias Mexico, S.A.; Lineas Aereas De Nicaragua, S.A.; Lloyd Aereo Colombiano; Rutas Aereas Nacionales, S.A.; and Transportes Aereos Nacionales, S.A., Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA, Acting as Dade County Port Authority, Defendant.

CUBA AEROPOSTAL, S.A., Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA, Acting as Dade County Port Authority, Defendant.

Civ. Nos. 8990–M, 9820–M.

United States District Court
S. D. Florida,
Miami Division.

June 30, 1961.

As Amended Sept. 20, 1961.

Philip Schleit, Washington, D. C., J. Leo McShane, Miami, Fla., for plaintiffs.

Thomas G. Spicer, Paul G. Hyman, Miami, Fla., for defendants.

LIEB, District Judge.

This case involves two consolidated suits by various foreign airline compa-

nies, as plaintiffs, against the defendant, as operator of the Miami International Airport, in which the plaintiffs seek to enjoin the defendant from enforcing its presently prevailing rate schedule imposed upon the plaintiffs, claiming that the rate schedule violates the applicable provisions of the Chicago Convention (61 Stat. 1180) as well as the applicable provisions of certain Bilateral Air Transport Service Agreements (hereinafter referred to as Service Agreements).

The plaintiffs, now twelve in number, are all foreign airline corporations domiciled in various Latin American countries.

Plaintiff Aerovias Interamericanas De Panama, S.A. (hereinafter referred to as APA), is a corporation duly organized and existing under the laws of the Republic of Panama.

Plaintiff Aerolineas Peruanas, S.A. (hereinafter referred to as APSA), is a corporation duly organized and existing under the laws of the Republic of Peru.

Plaintiff Compania Cubana De Aviacion, S.A. (hereinafter referred to as Cubana), plaintiff Cuba Aeropostal, S.A. (hereinafter referred to as Cuba Aeropostal), and plaintiff Expreso Aereo Inter-Americano, S.A. (hereinafter referred to as Expreso), are corporations duly organized and existing under the laws of the Republic of Cuba.

Plaintiff Compania Ecuatoriana De Aviacion, S.A. (hereinafter referred to as CEA), is a corporation duly organized and existing under the laws of the Republic of Ecuador.

Plaintiff Empresa Guatemalteca De Aviacion, S.A. (hereinafter referred to as Aviateca), is a corporation duly organized and existing under the laws of the Republic of Guatemala.

Plaintiff Empresa De Transportes Aerovias Brasil, S.A. (hereinafter referred to as REAL), is a corporation duly organized and existing under the laws of the Republic of Brazil.

Plaintiff Guest Aerovias Mexico, S.A. (hereinafter referred to as Guest), is a corporation duly organized and existing under the laws of the Republic of Mexico.

Plaintiff Lloyd Aereo Colombiano (hereinafter referred to as Lloyd), is a corporation duly organized and existing under the laws of the Republic of Colombia.

Plaintiff Rutas Aereas Nacionales, S.A. (hereinafter referred to as RANSA), is a corporation duly organized and existing under the laws of the Republic of Venezuela.

Plaintiff Transportes Aereos Nacionales, S.A. (hereinafter referred to as TAN), is a corporation duly organized and existing under the laws of the Republic of Honduras.

All plaintiffs are engaged in rendering international air services, and all plaintiffs except APSA have been operating between their countries of domicile and the United States for many years prior to the institution of this action, using the Miami International Airport, pursuant to their Foreign Air-Carrier Permits issued by the Civil Aeronautic Board of the United States (hereinafter referred to as C.A.B.). APSA obtained its permit from said agency to fly its aircraft into the United States shortly before the institution of this action and commenced its international air service operation on September 15, 1960, between Lima, Peru, and Miami, Florida, utilizing the facilities of the Miami International Airport since that date.

Defendant, the Board of County Commissioners of Dade County, Florida, acting as Dade County Port Authority (hereinafter referred to as Port Authority), is a political subdivision of the State of Florida created by Chapter 22963, Laws of Florida 1945, as amended by Chapter 24296, Laws of Florida 1947, and as further amended. The defendant is, and for many years has been, the owner and operator of certain real property and the improvements and facilities built thereon, located in Dade County, Florida, and known as the Miami International Airport.

### History of the Airport

The Miami International Airport is presently the second largest airport in the United States in terms of international traffic, and it ranks sixth in terms of domestic passenger traffic. Due to its location, it affords the shortest connection for domestic airline service to international airline service, serving Latin America, of all the airports located in the southeast United States. Likewise, it affords the best connection in the southeast United States for both rail and air connections of cargo transportation in both domestic-international and international-domestic movements. The defendant operates said airport in its proprietary capacity, and collects charges from all airlines—foreign or domestic—using the airport. Defendant operates said airport under its own budget, meeting its operational expenses from its own revenues, and the general tax revenue of the State of Florida is not used for such purposes. Port Authorities created under similar laws are considered business corporations rather than governmental agencies. Broward County Port Authority v. Arundel Corp., 5 Cir., 206 F.2d 220, 223.

The original airport, a fraction of its present size, was owned by Pan American World Airways, Inc. (hereinafter referred to as Pan Am). In the latter part of 1945, the County of Dade issued certain revenue bonds in the total amount of $2,500,000, which bonds were sold shortly thereafter to Pan Am. Utilizing the proceeds of said sale, Dade County purchased the then existing airport from Pan Am for $2,500,000. In effect no money changed hands—Pan Am transferred title to the County in exchange for the bonds.

The airport so transferred consisted of 223 acres. Through diverse gifts from the United States Government, and through some additional purchases of large tracts made with funds provided by the United States Government, the original size increased considerably through the years.

The County, acting as Dade County Port Authority, took over the operation of the airport on January 1, 1946. Shortly prior to said date, on December 11, 1945, the defendant entered into a lease agreement for a term of 20 years commencing on January 1, 1946, and ending on December 31, 1965, with Pan Am for the rental of certain facilities of the airport. Effective the same date, defendant executed three other lease agreements, identical in form with the Pan Am lease, with the following airlines: Eastern Airlines, Inc., National Airlines, Inc. and Delta Airlines, Inc. These lines, together with Pan Am, will be referred to hereafter as the Big Four. At the time of the execution of these leases, Pan Am was the only United States airline, among the lessees just named, which then rendered international air services. National, the other member of the Big Four now flying internationally, did not do so until 1947.

On February 27, 1946, a fifth lease agreement, substantially identical in form with the Big Four leases, was entered into between the defendant and Taca Airways Agency, Inc., a service company for Taca, S.A., a foreign air-carrier, domiciled in the Republic of El Salvador. Taca used the airport in its international operation until about February, 1948, when it ceased permanently to operate its aircraft to Miami. Its lease was shortly thereafter terminated by mutual agreement of the parties.

It was not until 1955 that the third United States airline, Braniff International Airways, began scheduled international air services out of Miami.

On May 1, 1955, Pan Am and the defendant executed amendments to the original lease agreement of 1945, extending the term of said lease for thirty years from the date of completion of the new passenger terminal building, which date turned out to be 1959. Said amendments also included rental of space in the new terminal building and other real property, but continued the same basic schedule of fees and charges for the use of the airport facilities as they were determined

by the original lease. These amendments, however, provided a revision of the landing charges for the period from January 1, 1965, through December 31, 1973, and a further revision for the period from January 1, 1974, through December 31, 1980, and again from January 1, 1981, until the end of the term of the lease. At the same time identical amendments were executed to all the leases between the defendant and the other members of the Big Four.

On October 1, 1946, defendant promulgated a resolution (hereinafter referred to as Resolution 56) setting the rates and charges applicable to all airlines except the Big Four for the use of the airport and its facilities. Resolution 56, as originally adopted, remained in full force and effect until it was amended on February 16, 1960, but said amendment did not affect the rates and charges as they were set in 1946, and these are currently paid by each of the plaintiffs, pursuant to the provisions of Resolution 56.

On or about July 21, 1955, the present plaintiffs Expreso, Aeropostal, RANSA and TAN, and four other small foreign airlines, not parties to this action, filed their complaints with the C.A.B. requesting the Board to compel the defendant and the Big Four to equalize the airport charges and to eliminate the differential between the charges these plaintiffs were compelled to pay and those paid by the Big Four. These complaints were brought under the Civil Aeronautics Act of 1938, 49 U.S.C.A. § 401 et seq. Said complaints were considered by the Board and, after several extensive hearings, were dismissed. No treaty violation was considered by the Board in these proceedings although the complainants attempted to raise this point in their petition of reconsideration filed after the dismissal of said complaints, which raised, however, only the provisions of the Civil Aeronautics Act of 1938. At the same time the same airlines filed complaints in letter form with the Civil Aeronautics Authority (hereinafter referred to as CAA), which agency is now called the Federal Aviation Agency (herein-

after referred to as FAA), about the alleged overcharges imposed upon them by the defendant, but this proceeding also failed to produce any result. These complaints were based on the Federal Airport Act, 49 U.S.C.A. § 1101, which contains certain non-discriminatory provisions applicable to airports which had received Federal Funds, such as the Miami International Airport. Defendant was named respondent in both proceedings, and was fully aware of the nature of the grievances asserted in said complaints.

Plaintiff TAN has each and every month, since June, 1955, protested in writing to the defendant each and every payment it made to said defendant for use of defendant's airport.

Plaintiffs, having failed to obtain any relief from the above mentioned administrative agencies, as well as from the defendant, commenced this action on December 19, 1958.

### History of the Litigation

The original complaint in case No. 8990–M was brought by fourteen foreign airlines and four domestic airlines. Said complaint alleged that the action was brought pursuant to Title 28 U.S.C.A. § 1331 and § 1332 respectively, claiming the existence of diversity of citizenship with defendant as to all plaintiffs except Riddle Airlines, a Florida corporation, one of the then plaintiffs, as well as the requisite jurisdictional amount. It also claimed that the case involved a Federal question, alleging a cause of action based upon The Federal Airport Act (May 13, 1946, 60 Stat. 176, 49 U.S.C.A. § 1110), The Federal Aviation Act (August 23, 1958, 72 Stat. 737, 49 U.S.C.A. § 1301 et seq.), The Surplus Property Act (October 3, 1944, 58 Stat. 765, 50 U.S.C.A.Appendix, § 1622), as well as upon certain deed restrictions contained in the Quitclaim Deed from the Federal Government to the defendant and Section 8 of Article I of the United States Constitution (Uniformity of Taxation); as to each foreign airline, Article VI of the Federal Constitution (Supremacy Clause), and in addi-

tion certain provisions of various treaties of Friendship and Commerce and Consular Rights, the Treaty concerning the Convention on International Civil Aviation (hereinafter referred to as the Chicago Convention), and diverse Bilateral Air Transport Service Agreements (hereinafter referred to as Service Agreements) entered into between the United States and the countries of domicile of some of the plaintiffs.

Said complaint was brought on behalf of the named plaintiffs and other airlines similarly situated, and prayed for a preliminary injunction and permanent injunction against the enforcement of the provisions of Resolution 56. This original complaint did not seek money damages at law.

Defendant attacked the complaint by filing a motion to dismiss, challenging the jurisdiction of the Court over the subject matter and challenging the legal sufficiency of the complaint. The Court, after extensive hearing, denied the prayer for preliminary injunction with leave to renew same after the Court ruled on the motion to dismiss.

This Court, by its order entered July 2, 1959, dismissed the complaint of plaintiff Riddle Airlines on the ground that the requisite diversity was not present between it, a Florida corporation, and the defendant, and for failure to state a cause of action on Federal grounds; and also dismissed the complaint as to the other three domestic non-Florida airlines with leave to amend; but denied the motion to dismiss as to the foreign airlines, holding that they did plead adequately a claim for relief under the Chicago Convention and under the various Service Agreements. The Court further held that there are no administrative remedies available to these plaintiffs, and neither Title 28, § 1342 (The Johnson Act) nor the doctrine of comity prevents this Court from taking jurisdiction of this cause. However, the Court at the same time ruled that neither the diverse Federal Statutes relied on by the plaintiffs, nor the restrictions contained in the Quitclaim Deed conveying part of the airport to the defendant, gave a right to any of the plaintiffs to sue. Said order also denied the renewed motion filed by the plaintiffs for preliminary injunction on the ground that they failed to establish that they will suffer irreparable harm before final determination of this cause on the merits.

The three domestic airlines were unsuccessful in their efforts to file a legally acceptable complaint and the cause proceeded with the fourteen foreign airlines as plaintiffs on a complaint based solely on the alleged violations of Article 15 of the Chicago Convention and the corresponding provisions of the various Service Agreements, seeking an injunction to restrain the defendant from enforcing Resolution 56, and seeking a refund of the monies paid by the plaintiffs for the use of the airport, which were allegedly in excess of those paid by the Big Four, as an incidental relief to the primary equitable relief sought. This was, and still is, the only legal theory upon which this cause was permitted to proceed, in spite of the repeated efforts by the plaintiffs to assert a cause of action at law for damages in addition to the equitable relief prayed for.

In the meantime, the attorney for the plaintiffs attempted to add as party plaintiff the Cuban Airline Cuba Aeropostal without first having obtained a leave of Court to do so. The complaint of said airline was dismissed upon motion, whereupon the attorney for the plaintiffs filed a new action entitled Cuba Aeropostal, S.A., Plaintiff, vs. Board of County Commissioners of Dade County, Florida, Acting as Dade County Port Authority, Defendant, Case No. 9820–M–Civil, on behalf of said airline, which action was subsequently consolidated with Case No. 8990–M–Civil for all purposes, and accordingly these cases will be considered together by the Court.

In the course of the discovery proceedings, the defendant interposed a challenge to the authority of the counsel for the plaintiffs to bring this action on behalf of the plaintiffs. Pursuant to an order of the Court, the counsel for the

plaintiffs filed satisfactory documentary proof as to the authority to represent all the plaintiffs except plaintiff Lanica, which plaintiff was thereupon dismissed from this cause.

Shortly prior to the final hearing the defendant also challenged the capacity of certain plaintiffs to prosecute this action. This challenge, in the case of the three Cuban airlines, was based upon the claim that the appointment of an "intervenor" by the Castro Cuban Government in the interim effectively destroyed the corporate entity of said airlines, or at least sufficiently impaired their capacity to function as a corporation, necessitating a dismissal on the ground that the action as to these airlines is now asserted on behalf of improper plaintiffs, or at least requiring a substitution of the intervenor or the Cuban Government as the real party of interest.

At the same time, defendant challenged the right of the Venezuelan airline RANSA to maintain the suit based on the assertion that since said corporation was, and still is, in a "Receivership" in the Courts of its home country, the action cannot be continued by RANSA without permission from the "Receiver" to do so and, in any event, the action must be prosecuted in his name.

At the time of the trial, evidence was presented on behalf of the Cuban Airlines and RANSA in order to rebut these contentions of the defendant. The Court was then satisfied that the "intervention" proceedings in Cuba did not destroy the corporate entity of the said Cuban airlines, warranting a dismissal, or requiring a substitution of the intervenor of the Cuban Government as real party of interest for each of them. The Court, however, took judicial notice of the great political instability and uncertainty presently prevailing in said country and, with this in mind, ruled from the Bench that the Cuban corporate plaintiffs were entitled to remain in the action for the time being as plaintiffs without the suggested substitution. Since that time the conditions in Cuba have so further deteriorated that it is impossible now for the Court to know whether these Cuban plaintiffs are still in existence and entitled to recover as parties hereto. Therefore, special provision is made herein with regard to these plaintiffs.

The evidence presented on behalf of the plaintiff, RANSA, satisfies the Court that the appointment of Mr. Pedro Nadir Sarmiente as a "Depositor Judicial" by the Venezuelan Government was not a "Receivership" and did not destroy the corporate capacity of said plaintiff, necessitating a dismissal or a substitution of him as a real party in interest. The term "Depositor Judicial" was freely translated by counsel as a "Receiver". The Court is satisfied, however, that such an appointment did not create a receivership in the same sense as that term is understood in this country. The status of this so-called "Receiver" is similar to the status of the intervenors which are so frequently used in Latin American Governments in order to impose sanctions on private enterprises whose owners incurred the wrath of their governments. Their powers could be very extensive, but in the case of RANSA the Court is satisfied that his powers are quite limited. As a matter of fact, this "Receiver" does not have the power to act without the permission of one of the officers of said corporation, a certain Captain Jones, even as to corporation affairs in Venezuela, and he has no power at all to act on behalf of the corporation with regard to the affairs of the corporation in the United States. Therefore, in the opinion of the Court, this challenge to the capacity of RANSA to sue must be overruled.

### Contentions of the Parties

In considering the merits of the claims asserted on behalf of the plaintiffs, it is appropriate to state at the outset the various contentions of the parties. The plaintiffs contend that the enforcement of Resolution 56 by the defendant imposes higher charges and rates upon them for the use of the airport than is imposed on the Big Four in violation of Article 15 of the Chicago Convention and in violation of substantially identical pro-

visions contained in the various Service Agreements; that they, as citizens of countries which ratified said Convention and which countries were parties to the various Air Transport Service Agreements, are entitled to the relief sought from this Court; that they are and will be irreparably harmed unless the injunctive relief they seek is granted; and that this Court as a Court of Equity, in order to give full relief, should order the defendant to refund the alleged excess charges exacted from them as an incident to the primary relief they seek. The refund claim of the plaintiffs is asserted from January, 1955, up to and including the date of the commencement of this action, as well as from the date of the commencement of this action to the date of the trial, and from that date up to the date of the final decree which is to be entered in this cause. The claims pertinent to this latter period shall be determined, according to the plaintiffs, by taking additional proof covering said period.

The defendant contends that the enforcement of Resolution 56 is not in violation of Article 15 of the Chicago Convention, or the corresponding provisions of the various Service Agreements; that even if the enforcement of Resolution 56 is in violation of said treaties, the plaintiffs have no standing to assert a claim for such alleged violation since treaties are not self-executory, and in the absence of an enabling Act passed by Congress, there is no cause of action available to the aggrieved parties, and that the remedy, if any, for a treaty violation is only available to the contracting sovereign; that even if the plaintiffs have a standing to sue under the treaties, they must exhaust administrative or diplomatic remedies first before they ask this Court for relief; that it would be inequitable to grant the relief prayed for; that the plaintiffs are barred in a Court of Equity by the doctrine of laches and by certain Statutes of Limitations which the defendant contends are applicable; and that they are also barred by the doctrine of equitable estoppel, at least until 1965;

and that in any event, inasmuch as the monies they seek were paid voluntarily without coercion, they are not entitled to have them refunded. It is the opinion of the Court that none of these contentions has any merit and that the plaintiffs are entitled to the relief prayed for.

### Chicago Convention and The Bilateral Air Transport Service Agreements

The Chicago Convention was executed by the United States Government Representatives on December 7, 1944, and was duly ratified and approved as a treaty by the United States Senate on August 9, 1946. The Convention came into force on April 4, 1947, and was ratified by countries of domicile of all plaintiffs save one before 1955, the first year for which the plaintiffs are seeking refund of the alleged excess charges exacted from them in violation of the Convention. The Republic of Panama did not ratify the Chicago Convention until February 17, 1960, after the institution of this action. However, it is contended by this plaintiff that a Bilateral Air Transport Service Agreement entered into between the Republic of Panama and the United States, and in force since April 14, 1949 (63 Stat. (3) 2450, TIAS 1932, Art. 3), gives the identical right to the relief sought with those other plaintiffs who rely on the terms of the Chicago Convention.

The Chicago Convention provides in pertinent parts as follows:

"Article 15

"Every airport in a contracting State which is open to public use by its national aircraft shall likewise, subject to the provisions of Article 68, be open under uniform conditions to the aircraft of all the other contracting States. * * *

"Any charges that may be imposed or permitted to be imposed by a contracting State for the use of such airports and air navigation facilities by the aircraft of any other contracting State shall not be higher,

"(a) As to aircraft not engaged in scheduled international air serv-

ices, than those that would be paid by its national aircraft of the same class engaged in similar operations, and

"(b) As to aircraft engaged in scheduled international air services, than those that would be paid by its national aircraft engaged in similar international air services."

"Article 84

"If any disagreement between two or more contracting States relating to the interpretation or application of this Convention and its Annexes cannot be settled by negotiation, it shall, on the application of any State concerned in the disagreement, be decided by the Council. No member of the Council shall vote in the consideration by the Council of any dispute to which it is a party. Any contracting State may, subject to Article 85, appeal from the decision of the Council to an *ad hoc* arbitral tribunal agreed upon with the other parties to the dispute or to the Permanent Court of International Justice. Any such appeal shall be notified to the Council within sixty days of receipt of notification of the decision of the Council."

"Article 85

"If any contracting State party to a dispute in which the decision of the Council is under appeal has not accepted the Statute of the Permanent Court of International Justice and the contracting States parties to the dispute cannot agree on the choice of the arbitral tribunal, each of the contracting States parties to the dispute shall name a single arbitrator who shall name an umpire. If either contracting State party to the dispute fails to name an arbitrator within a period of three months from the date of the appeal, an arbitrator shall be named on behalf of that State by the President of the Council from a list of qualified and available persons maintained by the Council. If, within thirty days, the arbitra-

tors cannot agree on an umpire, the President of the Council shall designate an umpire from the list previously referred to. The arbitrators and the umpire shall then jointly constitute an arbitral tribunal. Any arbitral tribunal established under this or the preceding Article shall settle its own procedure and give its decisions by majority vote, provided that the Council may determine procedural questions in the event of any delay which in the opinion of the Council is excessive."

"Article 86

"Unless the Council decides otherwise, any decision by the Council on whether an international airline is operating in conformity with the provisions of this Convention shall remain in effect unless reversed on appeal. On any other matter, decisions of the Council shall, if appealed from, be suspended until the appeal is decided. The decisions of the Permanent Court of International Justice and of an arbitral tribunal shall be final and binding."

"Article 87

"Each contracting State undertakes not to allow the operation of an airline of a contracting State through the airspace above its territory if the Council has decided that the airline concerned is not conforming to a final decision rendered in accordance with the previous Article."

"Article 88

"The Assembly shall suspend the voting power in the Assembly and in the Council of any contracting State that is found in default under the provisions of this Chapter."

In addition to the provisions of the Chicago Convention, 10 plaintiffs (all except TAN of Honduras and Aviateca of Guatemala) also rely on certain Bilateral Air Transport Service Agreements executed by the United States and their nations of domicile. Since the Republic of Panama did not ratify the Chi-

cago Convention until after this suit was filed, the Court will consider briefly the Service Agreement between the Republic of Panama and the United States.

That Bilateral Air Transport Service Agreement was entered into by the Republic of Panama and the United States on April 14, 1949, and it is still in full force and effect. Said agreement incorporates the form agreement contained in the Chicago Convention, and it is undisputed that Article III of the Agreement prohibits the imposition of airport charges by a contracting party upon the aircraft of the other contracting party which are higher than those imposed upon its national aircraft. While it was not individually ratified by the Senate as a treaty, it is classified as such by the State Department,[1] and it is considered to be a compact having equal dignity with formal treaties in every respect. Executive agreements like the Service Agreement under consideration were declared valid when considered by the Courts, even when they were entered into without Congressional authorization.[2] There is no contention before this Court that there is a legal difference between provisions of the Chicago Convention and the provisions of the Service Agreements involved in these cases, and consequently these provisions shall be treated on an equal basis with those of the Chicago Convention, and all conclusions hereinafter stated by the Court with regard to the Chicago Convention shall be considered equally applicable to the corresponding provisions of said Service Agreements, including the Panamian Service Agreement presently under discussion.

## Construction and Interpretation of Treaties

The general attitude of the United States Supreme Court, in interpreting treaties, is well expressed by Justice Story who, in speaking for the Court in Shanks v. DuPont,[3] stated:

" * * * if a treaty admits two interpretations, * * * one of which will further and the other one of which will exclude private rights, the most liberal exposition should be adopted."

The Court reemphasized the same view through Justice Swayne in Hauenstein v. Lynham,[4] declaring the rule announced by Justice Story in the DuPont case to be the settled rule of the Court with regard to interpretations of treaties.

This same rule of construction was given an even broader application in De Geofroy v. Riggs, decided in 1890,[5] where, through Justice Field, the Court stated as follows:

"It is a general principle of construction, with respect to treaties, that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them. As they are contracts between independent nations, in their construction, words are to be taken in their ordinary meaning, as understood in the public law of [the] nations, and not in any artificial or special sense impressed upon them by local law, unless such restricted sense is clearly intended. * * * * "[6]

The rule of liberal construction of treaties stated by the Supreme Court is con-

1. "Treaties in Force," State Department Publication 6959, January 1, 1960.

2. United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796; United States v. Belmont et al., 301 U.S. 324, 330–331, 57 S.Ct. 758, 81 L.Ed. 1134; State of Russia v. National City Bank of New York et al., 2 Cir., 1934, 69 F.2d 44, 48; Colonial Airlines, Inc. v. Adams et al., D.C., 87 F.Supp. 242.

3. 3 Pet. 242, 249, 7 L.Ed. 666.

4. 100 U.S. 483–487, 25 L.Ed. 628.

5. 133 U.S. 258, 10 S.Ct. 295, 298, 33 L.Ed. 642.

6. See also: Tucker v. Alexandroff, 183 U.S. 424–437, 22 S.Ct. 195, 46 L.Ed. 264; Asakura v. City of Seattle, 265 U.S. 332, 342–343, 44 S.Ct. 515, 68 L.Ed. 1041, citing Hauenstein v. Lynham, supra; Jordan v. Tashiro, 278 U.S. 123, 128–129, 49 S.Ct. 47, 73 L.Ed. 214.

sistently followed by later decisions [7] of the Court and by State Courts.

Thus, in Barcardi Corporation of America v. Domenech, 311 U.S. 150, 61 S.Ct. 219, 225, 85 L.Ed. 98, the Court, speaking through the Chief Justice, stated:

> "According to the accepted canon, we should construe the treaty liberally to give effect to the purpose which animates it. Even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging rights which may be claimed under it, the more liberal interpretation is to be preferred." Citing Jordan v. Tashiro, 278 U.S. 123, 127, 49 S.Ct. 47, 73 L.Ed. 214; Nielsen v. Johnson, 279 U.S. 47, 52, 49 S.Ct. 223, 73 L.Ed. 607; Factor v. Laubenheimer, 290 U.S. 276, 293, 294, 54 S.Ct. 191, 78 L.Ed. 315.

In construing the treaty in question, this Court is bound to follow the rules of construction promulgated by the highest Court of the land.

In construing Article 15 of the Chicago Convention and Article III of the Panamian Air Transport Service Agreement, in accordance with the views just stated the conclusion is inescapable that the enforcement of Resolution 56 by the defendant is a direct and unequivocal violation of said treaties.

First, it is undisputed that the Miami International Airport is an "airport" within the meaning of said agreements. It is classified by the Federal Aviation Agency as an "international express airport" which is the highest classification given by that agency to airports serving transoceanic flights and having a runway length in excess of 7,000 feet. It cannot be seriously contended that such an airport is not subject to the provisions of the treaties under consideration.

Second, all plaintiffs engage in rendering scheduled international air services in and out of Miami. Some of the plaintiffs also engage in rendering non-scheduled international air services in and out of Miami. All plaintiffs are authorized to perform both scheduled and non-scheduled international air services by virtue of their Foreign Air Carrier Permits issued by the C.A.B.

Since the nationality of the aircraft is to be determined under Article 17 of the Convention by the country where the aircraft is registered rather than by the country where the owner of the aircraft is domesticated, it is appropriate to state that the plaintiffs did perform during the period pertinent, and are performing, their international air services with aircraft registered in their own country of domicile, or in some instances with aircraft registered in countries which are also signatories to the Chicago Convention.

Third, it is the contention of the plaintiffs that they are engaged in rendering "similar international air services" to those rendered by Pan Am and National, the two allegedly preferred airlines of the Big Four. It is the opinion of the Court that this contention is factually and legally correct. Pan Am flies its aircraft in scheduled services to every country in Latin America. National maintained until recently scheduled air services to the Republic of Cuba, and will no doubt resume said services as soon as the international political situation will permit it. Whether the aircraft utilized by Pan Am and National in these "international air services" are identical in type or size or

---

7. Valentine v. United States ex rel. Neidecker, 1936, 299 U.S. 5, 10, 57 S.Ct. 100, 81 L.Ed. 5; Clark v. Pigeon River Improvement Slide & Boom Co., 8 Cir., 1931, 52 F.2d 550; American Trust Company v. Smyth, 9 Cir., 247 F.2d 149; Guaranty Trust Company of New York v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224; In re Anderson's Estate, 1914, 166 Iowa 617, 147 N.W. 1098, 52 L.R.A.,N.S., 686; In re Infelise's Estate, 1915, 51 Mont. 18, 26, 149 P. 365; In re Zalewski's Estate, 292 N.Y. 332, 55 N.E.2d 184, 157 A.L.R. 87; Fischer v. Sklenar, 1917, 101 Neb. 553, 163 N.W. 861; Universal Adjustment Corp. v. Midland Bank, Limited, of London, England, 281 Mass. 303, 184 N.E. 152, 87 A.L.R. 1407.

propulsion with those utilized by the plaintiffs is clearly immaterial. However, since both subparagraphs c and d of Article 15 of the Convention speak of airport charges that "would be paid by its national carrier" and not "which is paid by its national carrier", it is reasonable to conclude that such determination is unnecessary in order to find the required similarity between the "international air services" under consideration.

Fourth, in order to determine whether the charges imposed upon the plaintiffs by the enforcement of Resolution 56 are "higher than those that would be paid by its national aircraft", it is necessary to analyze the charges imposed upon Pan Am and National and the charges imposed upon the plaintiffs.

### Analysis of the Prevailing Airport Charges

All Big Four airlines pay for the use of the airport according to the rates established by the original lease agreements executed late in 1945 between the defendant and said airlines. Said lease agreements became effective in January, 1946, and provided for a 20 year term. The lease agreement between Pan Am and the defendant is part of the record. Effective the same date, the defendant executed three other leases, identical in terms, with Eastern, National and Delta. All subsequent amendments to the Pan Am lease are also part of the record, and it is stipulated that the other three members of the Big Four have identical amendments to their leases.

The Big Four leases provide for two distinct types of charges to be paid by the lessees:

1. Rental for the space used.
2. Landing charges.

The rental commitment of the lessees is computed according to the square footage of the different types of facilities. These rental commitments are not higher per square foot for the same type of space than those paid by the plaintiffs. Due to the tremendous increase in the size of space rented by the Big Four since the first year of the leases, they of course pay considerably more rent now than they paid in 1946; but the same is true with regard to the rents paid by plaintiffs, who have been using the airport several years.

The landing charges are set forth in Paragraph 4 of Article II of each of said leases, and this paragraph provides that the landing charges are to be computed according to the scheduled flights as filed with C.A.B. on the first day of each month, and not according to schedules actually flown; and no account shall be taken of schedule changes made during the month, flight cancellations, extra section or of courtesy, test, training inspection or of ferry flights. The charges required to be paid by the lessees are as follows:

First three daily flight schedules, $200.00 per month per schedule

Next three daily flight schedules, $100.00 per month per schedule

Next three daily flight schedules, $50.00 per month per schedule

All over nine daily flight schedules, $25.00 per month per schedule

———◆———

Said paragraph further provides that these fees apply only to aircraft having a maximum weight of 30,000 pounds and all landings by aircraft in excess of such weight shall be charged for in accordance with a table set forth in each of said leases. Said table provides for an increase in the above stated landing charges based on the excess weight of the aircraft but in a descending scale.

Said leases and the pertinent amendments thereto further provide that the lessees are not to be charged with any other charges in addition to those just stated.

On the other hand, the plaintiffs and others not members of the Big Four pay five types of charges for the use of the airport in addition to the rent they pay for the space rented by them, which rent, as previously stated, is computed substantially on the same square footage basis with the rents paid by the Big Four. Of the five types of airport charges imposed upon the plaintiffs by Resolution 56, four types are not imposed on the Big Four at all. These are:

First: $ .50 per passenger terminal charge

Second: $2.00 per ton cargo terminal charge

Third: 5% indirect surcharge on all aviation gasoline and oil

Fourth: 5% indirect surcharge on all meals to be served aloft, and purchased at the airport

The fifth type of charge known as the landing charge is paid by all users of the airport, including the Big Four, whose landing charge schedule has been discussed above. The landing charges imposed upon the plaintiffs are computed on the basis of actual landings and on a different scale from those applicable to the Big Four. (Stipulated Exhibit 7.) The comparison of the respective landing charges imposed upon the Big Four and upon the plaintiffs by the defendant presents some difficulty due to the different bases used for computation by the defendant. This difficulty, however, is not insurmountable. The number of landings made by each plaintiff in each month for the period in question is stipulated in the record; the weight of the aircraft and the total charges paid for said landings are also stipulated. Applying the basis for landing charges set forth in the Big Four leases to the same number of landings with the same weight of aircraft made by the plaintiffs, the conclusion is inescapable that the charges for landings imposed upon the plaintiffs by the enforcement of Resolution 56 are substantially higher than those imposed upon the Big Four even though the Big Four are charged per schedule and not per actual landings.

The defendant, in an attempt to justify the obviously preferential treatment accorded to the Big Four, strongly urges that such preferential treatment was justly accorded to the Big Four for two reasons:

First: Under the 1945 Lease they have assumed a contingent liability to pay possible operational deficits on the airport; and

Second: They are large tenants, and, therefore, due to their large rental commitments, they merit special consideration.

Neither the Chicago Convention nor the Air Transport Service Agreements contain any exception to the mandatory language appearing in Article 15 of the Convention, and in the corresponding section of the Service Agreements. Furthermore, such contentions have no merit in consideration of the facts of the case.

First, the so-called contingent liability terminated on July 1, 1947, when the original $2,500,000 bond issue was redeemed and it was formally eliminated from the leases by the execution of an amendment thereto on August 8, 1950. Even while said contingent liability was in force, such so-called contingent liability was in fact meaningless since Paragraph 5(d) of Article II of the same leases provided that in the event there is a deficit in the operation of the airport the charges payable by the Big Four shall be increased accordingly to meet such deficits; but it also provided that profits over and above a specified working capital fund should be paid to the "regular air transportation companies", i. e., the Big Four. Hence, the Big Four, while they were referred to as sustaining les-

sees, were in the nature of joint venturers in the operation of the airport since they were to share profits as well as losses, but without the obligation to pay any real estate taxes since the title to the airport was vested in the defendant alone at all times. Moreover, said leases gave the Big Four a virtual veto power over the operation of the airport through their right to control the operational budget of the airport. It is not surprising, therefore, that they were never called upon to respond to their so-called obligation while it was in existence.

As to the second contention advanced by the defendant, it will suffice to state that said contention is without merit because it simply does not correspond to the undisputed facts. The total monthly rental paid by National in 1946, the first year of its lease, was the sum of $85.93, which can hardly be called a substantial rent when RANSA, one of the plaintiffs, for instance, pays the sum of $2,644.66 as rent. Furthermore, in the opinion of the Court, the test is not the "reasonableness" of the charges imposed but that the charges "shall be no higher than" according to the provisions under consideration. Said provisions do not employ the term "just" or "reasonable" in referring to the charges, and they do not speak of discrimination. It would be, indeed, amending said provisions if such a strained construction were to be applied to words which have an ordinary, everyday meaning and which are clear and unambiguous.

The defendant also contends that the Chicago Convention and the Service Agreements are not violated because not *all* United States airlines engaged in rendering "similar international air services" are receiving this alleged preferential treatment, and in this connection points out that Braniff, a United States airline which is also engaged in international flight services similar to those rendered by the plaintiffs, pays airport charges pursuant to Resolution 56 on the same basis as the plaintiffs. This contention is equally without merit. The same argument was advanced in the case of Bacardi Corporation of America v. Domenech, supra, where the Supreme Court disposed of it by stating:

"* * * a ratifying State cannot escape the obligations of the treaty and deny protection by the simple device of embracing its own nationals in that denial. That would make a mockery of the treaty * * *" [311 U.S. 150, 61 S.Ct. 227.]

The fact that some United States citizens, like Braniff, or other aliens do not have the protection of the treaty under consideration is no bar to these plaintiffs' rights in this case. See Asakura v. City of Seattle, supra, where the same view was expressed by the Supreme Court in considering a certain United States Japanese Treaty, which in fact gave a more favorable treatment to Japanese nationals than to other aliens who did not have a same treaty.

In the light of the reasons just stated, it cannot be gainsaid that the absolute command of Article 15 of the Chicago Convention, and corresponding provisions found in the various Service Agreements, is not applicable to the plaintiffs and to the operation of the airport, and in the opinion of the Court the enforcement of Resolution 56 by the defendant, as far as it affects these plaintiffs, is a violation of said treaty provisions.

Defendant, while not admitting such violation, contends, however, that even if said treaties are violated by the enforcement of Resolution 56, the plaintiffs have no right thereunder which they can enforce in this Court because:

1. Said treaties are not self-executing and, in the absence of an enabling or implementing legislation by Congress, the plaintiffs have no cause of action or a claim upon which relief can be granted.

2. These plaintiffs have no standing to sue because they have failed to exhaust certain administrative remedies; particularly they have failed to follow the exact procedure set forth in Article 84, et seq., of

the very treaty under which they claim.

The Court cannot accept either of these contentions for the reasons hereafter stated.

### Are the Treaties under Consideration Self-Executing?

The capacity to enter into international agreements and the performance of said agreements are two distinct and separate facets of the treaty process. In countries with written Constitutions like the United States and Switzerland, this distinction is negligible since treaties once constitutionally concluded become ipso facto the law of the land.[8] Countries without written Constitutions like Great Britain follow a dualistic view that international law and national (or municipal) law are essentially different, and the former does not become the law of the land without municipal legislation.[9] For example, the British Parliament, unlike the United States Congress, passed an enabling or implementing act in order to "execute" the provisions of the Warsaw Convention, and without such legislation the British Courts would not enforce its provisions.

Although treaties, when validly concluded, are by virtue of the Federal Constitution the "supreme Law of the Land", not all treaties are considered to be "the supreme Law of the Land" in the absence of implementing legislation by Congress.[10] Treaties of this type are characterized as not self-executing contracts, distinguishing them from those types which do not require implementing legislation before their provisions are given effect in the Courts.

Whether a given treaty is "self-executing" or requires special implementing legislation in order to give force and effect to its provisions, through the aid of the Courts, presents primarily a domestic question of construction for the Courts, but it is difficult to extract any clear principle for judicial guidance from the cases discussing this subject.[11]

A careful study of the decisions dealing with this problem indicates, however, certain recurring factors which were considered by the Courts to be controlling in the ultimate solution of this problem.

Where a treaty is incomplete either because it expressly calls for implementing legislation or because it calls for the performance of a particular affirmative act by the contracting sovereigns, which act or acts can only be performed through a legislative act, such a treaty is for obvious reasons not self-executing and subsequent legislation must be enacted before such treaty is enforceable by the courts.[12] Thus, the United States Supreme Court in Foster and Elam v. Neilson, supra, held that since Article 8 of the treaty between the United States and Spain of February 22, 1829, the treaty involved in that case, called for the confirmation and ratification (a performance of a particular act) of certain grants to the persons in possession, said treaty must be considered to be not self-executing because the mutual promises of the signatories cannot be fulfilled without the aid of implementing legislation. As stated in that case on page 314 of 2 Pet. by Chief Justice Marshall, speaking for the Court:

"Our constitution declares a treaty to be the law of the land. It is,

8. U.S.Const., Article 6, cl. 2.

9. Mortensen vs. Peters (1906), Scottish Law Reports 277.

10. Foster and Elam v. Neilson, 2 Pet. 253, 7 L.Ed. 415; Z. & F. Assets Realization Corporation v. Hull, 72 App.D.C. 234, 114 F.2d 464; Robertson v. General Electric Co., 4 Cir., 1928, 32 F.2d 495; Vanity Fair Mills v. T. Eaton Co., D.C., 133 F.Supp. 522.

11. Anderson Chandler P. The Extent and Limitations of the Treaty Making Power under the Constitution, (1907 AJIL 613, p. 641).

12. Foster and Elam v. Neilson, supra; Robertson v. General Electric Co., supra; Z. & F. Assets Realization Corporation v. Hull, supra; Rousseau v. Brown, 21 App.D.C. 73; Accumulator Co. v. Julien Electric Co., C.C., 57 F. 605.

consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract—*when either of the parties engages to perform a particular act,* the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract, before it can become a rule for the court." (Emphasis supplied.)

Section 308 of the Treaty of Versailles of March 20, 1883, considered by the Court in Robertson v. General Electric Co., supra, [32 F.2d 496] provided that: "* * * the rights of priority * * * *shall be extended by each of the high contracting parties* * * *"*, said provision also calling for the performance of a particular act; therefore said provisions were held to be not self-executing. (Emphasis supplied.)

■ Inasmuch as treaties calling for expenditure of funds are ineffective without an accompanying appropriation, they are uniformly considered to be not self-executing.[13]

Even these decisions recognized the principle that a treaty may confer private rights which will be enforced by the courts, if they are presented in a justiciable case or controversy. This view was stated by the Court in Z. & F. Assets Realization Corporation v. Hull, supra, 114 F.2d on page 470, as follows:

"But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. * * *. A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute."

See also Edye v. Robertson (Head Money Cases), 112 U.S. 580, 5 S.Ct. 247, 28 L. Ed. 798.[14]

■ On the other hand, where a treaty is full and complete,[15] it is generally considered to be self-executing by the courts, especially when the treaty is concerned with granting equal treatment to aliens in the field of commerce and trade between the signatory powers to such treaties. For instance, the United States Supreme Court in Asakura v. City of Seattle, supra, in holding that the treaty of April 5, 1911, between the United States and Japan (3 Treaties, etc. Redmond 1923, 2712) entitled a Japanese national to carry on the business of a pawnbroker in spite of a municipal ordinance of the defendant limiting that occupation to American citizens, stated, through Justice Butler, 265 U.S. on page 341, 44 S.Ct. on page 516:

"A treaty made under the authority of the United States— 'shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.' Constitution, Art. 6, § 2.

13. Turner v. American Baptist Missionary Union, Fed.Cas.No.14,251, 5 McLean 344.

14. In neither of these cases were the plaintiffs, who invoked alleged treaty rights, successful; but in the Z. & F. case plaintiff failed because the claim, which the court viewed as political, did not present a justiciable case or controversy in the opinion of the court, and

in the Head Money cases they failed because the treaty rights on which they relied were superseded by an Act of Congress and the court held that in case of a conflict between a treaty and an Act of Congress the latter in time would control.

15. Dainese v. Hale, 91 U.S. 13, 23 L.Ed. 190.

" \* \* \* The treaty is binding within the state of Washington. Baldwin v. Franks, 120 U.S. 678, 682–683 [7 S.Ct. 656, 763, 32 L.Ed. 766]. The rule of equality established by it cannot be rendered nugatory in any part of the United States by municipal ordinances or state laws. It stands on the same footing of supremacy as do the provisions of the Constitution and laws of the United States. *It operates of itself without the aid of any legislation,* state or national; and it will be applied and given authoritative effect by the courts." (Emphasis supplied.)

The same principle was expressed thus by a California District Court in 1913 in the case of Ex parte Toscano, 208 F. 938, 942:

"Petitioners \* \* \* contend, that The Hague Treaty, relating to internment, is not self-executing. This position is untenable. \* \* \* The treaty is full and complete, and *no legislation is necessary to its enforcement.*" (Emphasis supplied.)[16]

A treaty, providing that *no higher or other duties shall be levied* upon goods imported in the vessels of one party to the treaty than upon those imported by the other party, was considered by the Court of Customs Appeals in the Five Per Cent Cases, 6 Court of Customs Appeals 291, 328–331. It is noteworthy that the equality provisions contained in this treaty are phrased in the same manner as those in Article 15 of the Chicago Convention. The Court held said provisions to be self-executing and did not require implementing legislation in order to give them effect.

The Warsaw Convention, a treaty dealing with international aviation just like the treaties and agreements involved in the cases at bar, is held to be self-executing, thus requiring no implementing legislation in order to enforce its provisions in the courts; and the provisions are, in fact, enforced and binding on the courts even though no implementing legislation was ever passed by Congress.[17]

Finally, treaties which contain the so-called "most favored nation" clause are uniformly held to be self-executing. Thus, the Malloy Treaties include a list of more than fifty countries with which treaties containing the most favored nation clauses have been concluded by the United States. A number of treaties containing similar clauses have been concluded by the United States since Malloy's volumes were published in 1910. Legislation was not adopted to give effect to the most favored nation clauses of these numerous treaties. It would seem that foreign Governments with whom the United States concludes treaties have a right to expect that in the future as in the past the treaty commitments of the Government of the United States with respect to most favored nation treatment will be observed regardless of whether legislation is or is not adopted.[18]

Although the construction placed upon treaties by the political department of the government is not conclusive and binding on the courts, it is of much weight.[19] The views expressed by the Department of State, through Secretary Hughes, are very illuminating in this regard. In a communication to Rep. Porter, the Secretary stated as follows:

16. See also: In re Lee Sing, C.C., 43 F. 359.

17. Noel v. Linea Aeropostal Venezolana, D.C., 144 F.Supp. 359; Indemnity Ins. Co. of North America v. Pan Am. Airways, D.C., 58 F.Supp. 338.

18. The Solicitor for the Department of State (Hackworth) to the Solicitor General (Mitchell), July 19, 1928, MS. Department of State, file 711.622/101.

19. Sullivan v. Kidd, 254 U.S. 433, 41 S. Ct. 158, 65 L.Ed. 344; Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274; Argento v. Horn, 6 Cir., 241 F. 2d 258, certiorari denied 355 U.S. 818, 78 S.Ct. 23, 2 L.Ed.2d 35, rehearing denied 355 U.S. 885, 78 S.Ct. 145, 2 L.Ed. 2d 115.

"Generally, unless the treaty contains an express stipulation for legislative execution or belongs to that *exceptional* category of treaties which cannot from their nature be given effect as the law of the land ex proprio vigore it would appear that the question is simply one of construction. If the treaty was intended to be self-executing it has immediately the effect of law. If not, it requires legislation before it can become the rule for the courts." [20] (Emphasis supplied.)

At the time the treaties in question were sent to the Senate for ratification, there was no request from the State Department for any implementing legislation, and it would be absurd to suppose that the President concluded said treaties, not intending to abide by the solemn undertakings contained therein.

The treaties involved in this case do not call for express implementing legislation; do not call for the performance of a particular act by the signatory powers; do not require the expenditure of funds; but are full and complete, and they represent an undertaking by the contracting sovereigns to assure an equal treatment of their citizens or subjects within their respective territories in the use of air navigation facilities, which are undoubtedly part of commerce and trade between the contracting parties.

▬▬▬ Therefore, it is the opinion of the Court that Article 15, et seq. of the Chicago Convention, and the corresponding article of the various Air Transport Service Agreements, are self-executing, requiring no legislation in order to effect their command by this Court. Consequently, said provisions being the supreme law of the land, capable of enforcement in the Courts, they cannot be rendered nugatory by any conflicting ordinance, resolution or state law.[21] Where the treaty is the law of the land and as such affects the rights of the parties litigating in courts, that treaty, as such, binds those rights and is as much to be regarded by the courts as an Act of Congress.[22] A treaty conferring private rights on citizens or subjects of the contracting parties is enforceable in the courts of justice.[23] A Federal treaty or statute, establishing rules and regulations touching on the rights, privileges or obligations of aliens as such, is the supreme law of the land and no state can add to and take from the force and effect thereof.[24] Courts have no right to annul or disregard provisions of a treaty upon any notion of equity, general convenience or substantial justice.[25]

The plaintiffs are, therefore, entitled to the aid of this Court unless they shall be barred because of their failure to exhaust "other" remedies, either administrative or diplomatic, which are available to them according to the contentions of the defendant.

## Exhaustion of Administrative Remedies

In this connection the defendant contends that, even if the treaties under consideration are self-executing, the plaintiffs have no standing in this Court because, first, they have failed to follow the grievance procedures provided for in the very treaty they are suing under

20. 311924 MS. Dept. of State, file 711.-419/94.

21. Baker v. City of Portland, Fed.Cas.No. 777, 5 Sawy. 566; In re Lee Sing, supra; In re Tiburcio Parrott, 6 Sawy. 349, 1 F. 481; Asakura v. City of Seattle, supra; Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633; Amaya v. Stanolind Oil & Gas Co., 5 Cir., 158 F.2d 554, certiorari denied 331 U.S. 808, 67 S.Ct. 1191, 91 L.Ed. 1828; Buck v. Harton, D.C., 33 F.Supp. 1014; Bacardi Corporation of America v. Domenech, supra; International Transit Co. v. City of Sault Ste. Marie, D.C., 194 F. 522.

22. The Peggy, 1 Cranch 103, 5 U.S. 103, 2 L.Ed. 49.

23. Edye v. Robertson, supra.

24. Hines v. Davidowitz, 312 U.S. 52, 61 S. Ct. 399, 85 L.Ed. 581; Amaya v. Stanolind Oil & Gas Co., supra.

25. King Features Syndicate v. Valley Broadcasting Co., D.C., 43 F.Supp. 137, affirmed in 5 Cir., 133 F.2d 127.

(Article 84 et seq.) or, second, their remedy, if any, must be sought from the various administrative agencies charged by Congress with the administration of aviation matters before they are entitled to resort to the courts of the United States. Neither of these contentions has any merit.

 It is a well established principle of international law that each state is responsible for its internal governmental machinery. By virtue of the United States Constitution,[26] the judicial power of the United States extends to all cases at law and in equity, arising under the "treaties made or which shall be made under the authority of the United States". By virtue of the foregoing provisions, private alien litigants have constantly invoked the aid of the courts for the purpose of securing recognition of privileges claimed under treaties of the United States and with the full assurance that the supremacy of such agreements over any inconsistent State Statutes or previously enacted Acts of Congress would be recognized.[27]

The State Department has taken the view consistently, which view is repeatedly expressed in diplomatic correspondence, that aliens aggrieved by local (state) infringements of alleged treaty rights should exhaust their judicial remedies first,[28] before they are to receive any aid by the Political Department through diplomatic channels. According to the State Department, when an alien invokes the aid of courts in order to secure recognition or enforcement of a privilege alleged to have been accorded to him by a treaty with his country, his action possesses in one sense merely a domestic character. He simply attempts to obtain respect for the law of the land, wherein the provisions of the treaty, like those of an Act of Congress, are supreme. It is not until the contracting State of which he is a national interposes and challenges, through diplomatic channels, the local, judicial construction applied to the treaty involved, that the question attains international significance.

Mr. George J. Salem of the State Department voiced the same view replying to an inquiry, stating:

" * * * under the Constitution of the United States and the division of powers therein provided, the determination as to rights claimed by aliens under treaty provisions, is placed not with the Executive but with the Judiciary. As far back as 1794 the question of interposition by the Federal Executive, in suits concerning aliens, was formally brought to the attention of this Department, and at that time the Attorney General rendered an opinion in which it was decided that whenever an alien (even an official of his government as was the fact in that particular case) invokes a right under treaty, *he must plead it in the usual course of judicial proceedings,* and until the regular course of such proceedings shall have failed to do justice to the alien, there can be no complaint to the National Executive. So far as I am advised, it is the general rule that aliens desiring to determine their rights either under

26. United States Constitution, Article III, Sec. 2, par. 1.

27. Todok v. Union State Bank of Harvard, 281 U.S. 449, 50 S.Ct. 363, 74 L.Ed. 956; Nielsen v. Johnson, supra; Santovincenzo v. Egan, 284 U.S. 30, 52 S.Ct. 81, 76 L.Ed. 151; Amaya v. Stanolind Oil & Gas Co., supra; International Transit Co. v. City of Sault Ste. Marie, supra; In re Tiburcio Parrott, supra.

As to supremacy of executive agreements, see: United States v. Pink, supra; United States v. Belmont, supra, and State of Russia v. National City Bank of New York, supra.

28. Aid Memoire by Secretary of State Bayard to Baron Fava, Italian Minister, Dec. 18, 1888, MS. Notes to Italy VIII 315.

Communication of Secretary Hay to Signor Carignari, Italian Charge D'Affaires, August 24, 1901. For.Rel.1901, 308.

treaty or under the general laws must resort to the appropriate court."[29]

■ The same position was taken by the State Department when the Italian Ambassador objected to a Florida Statute which imposed $50 license fee for alien fish dealers and only $5 license on resident citizen fish dealers, contending that such provisions were in violation of the equality provisions of the Treaty between the United States and Italy. (Malloy, 1910/969.) The Department of State replied that, under the Constitution of the United States, treaties are the supreme law of the land and as such are enforceable in the courts. The reply further stated that this principle is especially applicable when a complaint has been made that a state law is in conflict with the existing provisions of a valid treaty. In that case the authorities of Florida have taken the position that no such conflict exists. In that event, stated the State Department, "it is competent for any Italian subject, who feels aggrieved by the tax in question, to apply to the courts of the United States."[30] The Department later stated on the same subject matter:

" * * * It should be observed, finally, that while the procedure outlined contemplates the bringing of a suit by an individual Italian national in the Federal Courts of this country, such action *is the only measure* whereby the matter can be .tested in the Courts."[31] (Emphasis supplied.)

By applying the foregoing principles to the contentions under consideration, the Court is of the opinion that said contentions are without merit. A fair reading of Articles 84, 85 and 86 of the Chicago Convention indicates that these provisions are applicable only if there is a disagreement or dispute as to the interpretation of the treaty provisions between the contracting parties themselves. The Court is not confronted in this case with a dispute as to the meaning of Article 15 of the Chicago Convention between the United States Government and the governments of the plaintiffs, but with a dispute between individual citizens of countries which are signatories to said Convention. There is no claim or contention in this case that the United States fails to abide by the provisions of Article 15, or that the United States in any way violates said provisions. The dispute forming the basis of this litigation is purely domestic in character, and the arbitration procedures outlined in Article 84 et seq., of the Chicago Convention have no application whatsoever to the instant dispute.

■ The so-called other administrative remedies which the plaintiffs should exhaust before they are entitled to seek relief before the courts simply do not exist. The Federal Administrative Agencies charged by Congress with the administration of aviation matters are not only completely powerless to give any relief to these plaintiffs but, as a matter of fact, they have failed to do so when they were faced with this problem either on the ground that they lacked jurisdiction in this matter or because the grievances presented to them at that time were not based on the alleged violation of treaty rights but on the provisions of various Federal statutes. (The Court held in this case that the Federal Aviation Act does not provide a legal basis to these plaintiffs for the relief they are seeking in this action.)

For reasons just stated, the plaintiffs' alleged failure to exhaust "other remedies" is not a bar to maintain this action and they should prevail unless the affirmative and other defenses, raised by the defendant, would defeat their right to the relief they are seeking.

29. Department of State, Arbitration Serv. 4(6), 1933, pp. 91–92 (U. S. vs. Egypt)

30. MS. Dept. of State File, 811623, Fla/7.

31. Secretary Kellogg to Mr. De Martino, June 8, 1928; Department of State file 811.623, Fla/10.

### Affirmative and Other Defenses

The affirmative and other defenses raised by the defendant can be grouped in two categories:

 1. Those addressed to the prayer for injunctive relief: doctrines of laches and equitable estoppel.

 2. Those addressed to the claims for refund of monies collected by the defendant in violation of the treaty rights: Statute of Limitation of the State of Florida, 95.08 F.S.A., and the contention that the monies the plaintiffs seek to recover were payments voluntarily made by the plaintiffs without any coercion or duress; therefore they are not entitled to recover them.

These contentions will be taken up seriatim.

■ First, it is the contention of the defendant that the plaintiffs are barred by the doctrine of laches in their attempt to obtain the injunctive relief, at least until 1965, because all the plaintiffs knew, or should have known, their alleged rights under the treaties, and they have unduly delayed the enforcement of said rights to the detriment and prejudice of the defendant. This contention is wholly untenable in the light of the record in this case. Although all plaintiffs base their rights on the treaties and agreements which were in force as to most of the plaintiffs for over 10 years, not all plaintiffs commenced their operation at the airport at the same time; and it is obvious that, until a given plaintiff is paying these charges which are in violation of said treaties, it has no right to complain about them. The majority of the plaintiffs apprised the defendant, immediately or shortly after it commenced operating at the airport, that they would not acquiesce in the charges imposed upon them which they considered to be in violation of their treaty rights. Moreover, the formal complaints lodged by certain plaintiffs with the CAA and the C.A.B. clearly apprised the defendant that it was faced with a serious challenge of the legality of Resolution 56. The defendant was a party to those proceedings and actively participated in them.

Their actions were filed 21 months after said agencies rendered their final decisions refusing to grant any relief to the complaining plaintiffs.

The delay in instituting these actions, if any, was at least partly caused by the defendant, whose officers promised some relief or adjustment of the charges to the complaining plaintiffs as far back as 1955.

In addition to the defendant's failure to show undue delay on the part of the plaintiffs in instituting these actions, the defendant wholly failed to sustain its burden of establishing that it was in any substantial degree prejudiced by this alleged delay.

■ This leads to the defense of equitable estoppel raised by the defendant. This defense is based on the allegations that the inaction of the plaintiffs, or their alleged silence and their conduct in general, lulled the defendant Port Authority into a false security, causing the defendant to rely on said conduct, which induced the defendant to embark on a large expansion program at the airport incurring thereby a tremendous indebtedness; therefore, it would be inequitable to grant the injunctive relief sought at least until 1965 when the rate schedule of the Big Four will be revised. It is intimated by the defendant that it would not have expanded the airport if it had known there was a possibility that someone would challenge the enforcement of Resolution 56. This contention indeed taxes credulity. First, long before the expansion of the airport was decided upon, the defendant was well aware of the complaints of some of the foreign airlines. Second, there is no evidence in the records that the expansion of the airport depended in any respect on the express or implied approval of the plaintiffs, which was neither sought nor given. The Revenue Bonds issued by the defendant were not validated by the Dade County Circuit Court until after this suit was filed. It is true that the indebted-

ness which was to be repaid from the proceeds of those bonds was partially incurred before the complaints referred to above were filed with the Federal Agencies, but the expansion was not decided upon until 1955, after said complaints were filed. In this connection it is further contended that, if these plaintiffs are completely successful in these actions, the defendant will be unable to meet its future financial obligations due to the alleged loss of revenue which will result if the injunction is granted, and furthermore the defendant would be financially ruined if the refund claims sought by the plaintiffs are allowed. The records in these cases fail to substantiate either of these contentions. First, the Bond Prospectus prepared by the defendant in connection with the issuance of said Bonds indicates that the defendant anticipates an increase in revenue of six to ten million dollars between 1960 and 1970 after taking into account all possible rate adjustments which the defendant will have to make in the event the injunction sought for is granted. Second, said Bond Prospectus also provided for an escrow fund which has been set aside by the defendant for the very purpose of satisfying the refund claims involved in these actions in the event said claims are granted by the Court.

With regard to these refund claims sought by the plaintiffs, the defendant further contends that, since the payments sought to be recovered by the plaintiffs were voluntary and not made under any duress or coercion, they are not recoverable as a matter of law. The legal principle upon which this contention is based is a correct one, as a general statement of law; but as applied to the facts in the instant controversy, it is of no help to the defendant.

While it is true that the terms "duress" and "corecion" were construed by earlier decisions quite restrictively, and courts have denied recovery of monies paid unless the "duress" or "coercion" was immediate and compelling,[32] later decisions acknowledged that these concepts have been enlarged and liberalized in order to permit recovery of monies illegally exacted and paid under business and economic compulsion.[33]

The plaintiffs' rights to enter the United States and to engage in rendering international air services in the United States is a reciprocal right with the right of Pan Am and other United States airlines to engage in rendering similar air services in countries in Latin America, which countries are signatories to the Chicago Convention and to the various Service Agreements. However, routes and entry points to be used by these plaintiffs are determined by C.A.B. and are specifically stated in their respective Foreign Air Carrier Permits issued by that Agency. The point of entry specified in said permits of each of the plaintiffs is Miami, Florida, and therefore plaintiffs must land their aircraft at an airport in or near Miami, Florida, but only at an airport which has immigration, public health and custom facilities. The only such airport in or near Miami, Florida, is the airport operated by the defendant and involved in this litigation. Assuming, but not admitting, that there was no legal compulsion to use this airport, the economic compulsion to do so is undeniable. The Miami International Airport is the largest of all airports in the southeastern United States and is strategically located to furnish the most advantageous point of connection to the heavy east coast traffic moving to the north in the United States. As a practical matter, none of the plaintiffs has any choice in the selection of this airport as their point of entry into the United States.

The concept of duress or coercion in a legal sense was considered by the Supreme Court in Ward v. Board of County Commissioners of Love County, Okla-

---

32. Union Pacific R. R. Co. v. Dodge County Com'rs, 1879, 98 U.S. 541, 25 L.Ed. 196.

33. Richfield Oil Corp. v. United States, 9 Cir., 1957, 248 F.2d 217.

homa,[34] decided in 1920. The Court, in allowing the Indian plaintiffs to recover taxes collected in violation of a Federal statute, stated through Justice Van Devanter:

"* * * To prevent a sale and to avoid the imposition of a penalty of eighteen per cent. they yielded to the county's demand and paid the taxes, protesting and objecting at the time that the same were illegal. The moneys thus collected were obtained by coercive means—by compulsion * * *

"* * * It is a well-settled rule that 'money got through imposition' may be recovered back; and, as this court has said on several occasions, 'the obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.' (citing cases) To say that the county could collect these unlawful taxes by coercive means and not incur any obligation to pay them back is nothing short of saying that it could take or appropriate the property of these Indian allottees arbitrarily and without due process of law * * *"

 The defendant in the instant cases was and still is authorized by subsection 23, Chapter 25520, § 1, Laws of Florida 1949, to put a lien on any aircraft of any airline which fails to pay the airport charges imposed upon it, without the necessity of resorting to a judicial proceeding. The removal of an aircraft with such a lien is a misdemeanor. All airlines operating out of the airport are furnished detailed information about these provisions of the law. In view of these provisions of said law, the plaintiffs were confronted with the choice of paying the charges imposed upon them or being forced to suspend their operations in the United States while they litigated the validity of these charges in the courts.

Such choice under the circumstances was no choice at all. Although the records do not disclose that the defendant ever resorted to the use of this authority against these plaintiffs, the availability to do so represented sufficient duress and coercion. Therefore, the Court is satisfied that the payments which the plaintiffs seek to recover were not made voluntarily but were made under duress and coercion. Some of the plaintiffs protested each and every payment they made to the defendant ever since they commenced using the airport. The fact that all plaintiffs did not file complaints or protests years ago is immaterial to these equitable defenses. In Boardman v. Lake Shore & M. S. R. R., 1881, 84 N.Y. 157; 36 L.Ed. 720, it was held:

"Where circumstances indicate full knowledge of facts in regard to a claim against a person who has been advised of the same by the presentation of similar claims of other parties, which have been the subject of litigation, the doctrine of laches and acquiescence cannot be invoked as a defense."

 Finally, the contention is advanced by the defendant that Sec. 95.08 of Florida Statutes Annotated either completely bars said refund claims of the plaintiffs or limits them to the period of one year prior to the institution of this suit, to-wit, December 19, 1957. In discussing this contention, the Court is constrained to reassert that the claims of the plaintiffs were always, and still are, considered by this Court purely equitable and the refund claims asserted to be merely adjunct to the prime equitable relief sought and are not actions at law for damages.

Therefore, no statute of limitations can be applicable to these claims, and if the plaintiffs are barred they must be barred by the doctrine of laches. Since the Court has already stated that they are not guilty of laches, this defense must also fall. Even if the refund claims are considered to be legal in nature, and con-

---

34. 253 U.S. 17, 23–24, 40 S.Ct. 419, 422, 64 L.Ed. 751.

sequently subject to any applicable statute of limitations, it is the opinion of the Court that the one year limitation of the quoted statute does not apply to these claims.

 Claims analogous to the claims involved in the instant litigation were held by the courts not subject to the limitation contained in 95.08 F.S.A. Thus, action against counties to recover compensation for the value of land taken by the county without paying therefor need not be commenced within one year of the taking, since the right to make such claim is not a constitutionally valid substitute for the organic right to have full compensation first paid and secured by deposit in money.[35] The claims involved in this litigation are based on treaty rights. The illegally exacted overcharges sought to be recovered by the plaintiffs in these suits are equally not subject to this statute and their claims shall not be limited to the one year provided for in said statute.

 Moreover, the defendant is not a governmental subdivision of the state in the same sense as that term is understood and construed by the courts. Therefore, 95.08 F.S.A. has no application to the instant case. The Fifth Circuit Court of Appeals, in a case involving the Broward County Port Authority, which body was organized under a Special Act of the Florida Legislature similar to the one which created the defendant, held that the immunity from payment of interest available to counties is not available to the Port Authority because it is, in effect, a business corporation,[36] and it operates the airport not as a governmental agency but as a business corporation. The same principles are equally applicable to the defendant involved in the instant litigation.

Therefore, it is the holding of the Court that 95.08 F.S.A. does not limit or bar any of these refund claims and the plaintiffs are entitled to refunds to the extent hereinafter stated.

### The Scope of the Relief to Be Granted

Before embarking on a detailed discussion of the relief to which these plaintiffs shall be entitled, it is necessary in the light of changed circumstances to consider anew the status of the Cuban plaintiffs. Although the record in these cases satisfies the Court that the challenge interposed by the defendant to the corporate existence of said plaintiffs and to their respective capacity to remain as proper parties plaintiff to these actions was properly overruled at the time of the final hearing, due to the rapidly changing political situation in the Republic of Cuba, of which change the Court is constrained to take judicial notice, it is necessary in the opinion of the Court to treat these plaintiffs differently from the remaining plaintiffs. The political change referred to casts a serious enough doubt on the legal status of the Cuban plaintiffs to warrant this different treatment.

Inasmuch as it appears now that said plaintiffs have ceased to operate out of the Miami International Airport, the injunction to be granted in the instant actions will run in favor only of the non-Cuban plaintiffs and the right to injunctive remedy of the Cuban plaintiffs, if any, will not be adjudicated by the Court until the legal status of said plaintiffs can be ascertained with sufficient certainty—if and when they, or any of them, resume the use of the airport.

As to the refund phase of the relief which will be granted in the instant actions, due to the uncertainty concerning the existence of said Cuban corporations, as well as the uncertainty of the authority of the counsel for said plaintiffs to continue to act on behalf of said plaintiffs, the Court will not at this time adjudicate their rights, if any, to a refund. The Court will retain jurisdiction of these

---

35. Hillsborough County v. Kensett, 107 Fla. 237, 138 So. 400, 144 So. 393.

36. Broward County Port Authority v. Arundel Corporation, 5 Cir., 1953, 206 F.2d 220.

matters and will consider them upon a satisfactory showing that there is no just reason to delay the disposition of the claims of these plaintiffs.

### The Scope of the Injunction

Because the Court finds that Article 15 of the Chicago Convention and the corresponding Articles of the various Service Agreements—specifically Article III of the Panamian Agreement—prohibit the imposition of all charges for the use of the airport which are higher than those imposed upon Pan Am and National while said lines are rendering international air services similar to those rendered by these plaintiffs, the defendant shall be restrained to impose upon the non-Cuban plaintiffs the following charges:

1. Any and all amounts of passenger terminal charges, both inbound and outbound.
2. Any and all amounts of cargo terminal charges, both inbound and outbound.
3. Landing charges which are higher than those paid by Pan Am and National for the same usage of the airport. The defendant is entitled, however, to charge these plaintiffs on scheduled flight basis rather than on actual flight basis under the identical provisions which are applied to Pan Am and National as stated in the landing charges section of the lease agreements.

These prohibitions apply only as long as the charges stated in subparagraphs numbered 1 and 2 above are not imposed upon Pan Am and National or any other domestic airline which might engage in the future in rendering international air services similar to those which are rendered, or will be rendered, by these non-Cuban plaintiffs. This injunction does not prohibit a differentiation between scheduled and non-scheduled flights, since such differentiation is clearly permissible under Article 15 of the Chicago Convention or under the various Service Agreements.

As to the presently existing 5% surcharge imposed upon the non-Cuban plaintiffs' suppliers of aviation fuel and oil products, and meals to be served aloft, in order to establish the desired equality with Pan Am and National, whose suppliers are not charged the above stated surcharge, defendants shall be restrained from imposing upon the non-Cuban plaintiffs any and all charges, fees, licenses, excise taxes or tolls upon aviation fuel and oil products, and upon meals to be served aloft, sold or delivered to said plaintiffs at the airport; and the defendant shall be further restrained from charging or collecting from the suppliers of such products for the privilege of, or in connection with, the purchasing, delivering, handling, loading, unloading, using or transporting to or from said airport, of such materials or supplies in connection with the use of said airport by the non-Cuban plaintiffs. The object of this injunction is to eliminate the illegal inequality which now exists between the charges imposed upon these non-Cuban plaintiffs, or their suppliers, and the charges imposed upon Pan Am and National, or their suppliers; and the prohibition just stated against the imposition and collection of any and all concession charges from non-Cuban plaintiffs, or their suppliers, shall remain in effect only so long as Pan Am and National, and their suppliers (or any other domestic airline, and its suppliers, which might engage in the future in rendering international air services similar to those which are rendered, or will be rendered, by said plaintiffs) are free from said charges.

This injunction shall not be construed as giving a preferential treatment to these non-Cuban plaintiffs in any manner.

### Refunds to Which Plaintiffs Are Entitled

Inasmuch as the plaintiffs' repeated petitions for preliminary injunction filed in the course of this litigation were denied by this Court on the ground that. the amounts of the refunds could be

readily ascertained in the event there should be recovery, and that the defendant is financially capable to respond and satisfy any proper award which might be granted by this Court, the Court will allow refunds up to the date covered by the evidence rather than up to the date of the commencement of these actions. However, no refund will be allowed beyond said point as was requested by the plaintiffs. On refunds awarded to the non-Cuban plaintiffs for excess landing charges, passenger terminal charges and cargo terminal charges, interest at 6% per annum shall run from December 7, 1960, the date of the trial in this cause. On refunds awarded to the non-Cuban plaintiffs of 5% concession charges on sales of aviation fuel, interest at 6% per annum shall run from October 10, 1960, the date of the depositions of the representatives of the various suppliers. Although the computation of the excess landing charges presents some difficulty due to the different bases of computation used by the defendant, the Court adopts the method of computation suggested by the plaintiffs and described in plaintiffs' Exhibit 37. The proof presented in support of the claims for refund of the 5% concession charge indirectly imposed upon these plaintiffs on the gross sales of meals which are served aloft does not satisfy the Court to sustain such claims. Therefore, that portion of the refund claims of the respective plaintiffs shall be disallowed. Since plaintiff APSA failed to present any overcharges in the categories allowed, there will be no money judgment in favor of said plaintiff.

The following amounts, therefore, shall be awarded to the respective plaintiffs with the exception of plaintiff Aerolineas Peruanas, S.A., and the Cuban plaintiffs:

Plaintiff Aerovias Interamericanas De Panama, S.A., is entitled to recover from the defendant the sum of $30,723.79.

Plaintiff Empresa Guatemalteca De Aviacion, S.A., is entitled to recover from the defendant the sum of $28,257.03.

Plaintiff Compania Ecuatoriana De Aviacion, S.A., is entitled to recover from the defendant the sum of $12,498.19.

Plaintiff Guest Aerovias Mexico, S.A., is entitled to recover from the defendant the sum of $183,726.79.

Plaintiff Lloyd Aereo Colombiano is entitled to recover from the defendant the sum of $4,287.10.

Plaintiff Rutas Aereas Nacionales, S.A., is entitled to recover from the defendant the sum of $207,357.05.

Plaintiff Empresa De Transportes Aerovias Brasil, S.A., is entitled to recover from the defendant the sum of $74,565.65.

Plaintiff Transportes Aeros Nacionales, S.A., is entitled to recover from the defendant the sum of $128,011.19.

The plaintiffs are entitled, in addition to the above amounts, to interest at the rate of 6% per annum from December 19, 1958, the date of the original complaint.

Counsel for the plaintiffs shall prepare a final decree in accordance with the foregoing.

This memorandum opinion is considered to satisfy the requirements of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.